530 So.2d 579 (1988)
STATE of Louisiana
v.
David L. CARR.
No. 87 KA 1432.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
Writ Denied November 28, 1988.
*581 Bryan Bush, Dist. Atty., Baton Rouge by Richard Sherburne, Asst. Dist. Atty., for plaintiff/appellee.
Rosemary Bickford, Office of the Public Defender, Baton Rouge, for defendant/appellant.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
SAVOIE, Judge.
Defendant, David L. Carr, and his coperpetrator, Anthony Shawn Mareno, were charged in a single grand jury indictment consisting of six counts: (Counts I-IV) aggravated kidnapping, (Count V) armed robbery, and (Count VI) aggravated burglary, violations of LSA-R.S. 14:44, 64 and 60, respectively. Defendant was tried by a jury, which convicted him as charged on all six counts.[1] Subsequently, the trial court sentenced defendant to terms of imprisonment at hard labor as follows. For each aggravated kidnapping, defendant was sentenced to life, without benefit of parole, probation or suspension of sentence. For armed robbery, defendant received a sentence of forty-five years, without benefit of parole, probation or suspension of sentence; and, for aggravated burglary, defendant was sentenced to twenty years. The court ordered that all six sentences run concurrently with each other. Defendant has appealed, urging fifteen assignments of error:
1. The trial court erred by denying defendant's motion to suppress physical evidence.
2. The trial court erred by denying defendant's motion to suppress his confession.
3. The trial court erred by denying defendant's motion for a change of venue.
4. The trial court erred by denying a motion for individual voir dire.
5. The trial court erred by allowing the testimony of Lynn Brown concerning the effects of the ordeal on her family.
6. The trial court erred by allowing the testimony of Lynn Brown regarding the effect of the event on her son.
7. The trial court erred by allowing the testimony of Daniel Brown in regard to what Mr. Mareno had said.
8. The trial court committed error by allowing Daniel Brown's testimony regarding the effect of the ordeal on him.
9. The trial court erred by ruling admissible the statements made by Mr. Mareno at the scene.
10. The trial court erred by allowing the testimony of Daniel Brown regarding whether or not he has had problems since the occurrence of the instant offenses.
11. The trial court erred by allowing the prosecutor to question Martin Brown as to how he felt being tied up along with his mother and brother.
12. The trial court erred by denying a motion for mistrial.
*582 13. The trial court erred by denying defendant's motion for post-verdict judgment of acquittal.
14. There was insufficient evidence to support the jury's verdicts of guilty.
15. The trial court erred by imposing excessive sentences and failing to comply with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1.
Assignments of error numbers three and four were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.
The record reflects that the instant offenses occurred in Baton Rouge. At about 3:15 a.m. on June 30, 1986, defendant and Anthony Mareno forcibly entered the home of Ms. Laura Lynn Brown, the general manager of Ralph and Kacoo's Restaurant. Ms. Brown was asleep in her bedroom. Also sleeping in Ms. Brown's bedroom was her twelve-year-old son, Daniel. Johnny Templet, a thirteen-year-old friend of Daniel, was sleeping in Daniel's bedroom; and Martin Brown, Ms. Brown's eighteen-yearold son, was asleep in his bedroom. Both perpetrators were dressed in dark clothing, and each had a stocking covering his head.
Defendant came into Ms. Brown's bedroom and pointed a gun at her. The perpetrators brought Johnny Templet and Martin Brown into Ms. Brown's bedroom, where Mareno tied up the hands and feet of all three children. Defendant told Ms. Brown that his co-perpetrator would remain at her home while the two of them went to Ralph and Kacoo's Restaurant and that he expected her to open the restaurant safe in order that he could get the money. Defendant threatened harm to the children if Ms. Brown did not do as she was told, and he repeated the threat several times.
Ms. Brown testified that about 15-20 minutes elapsed before she and defendant left in her car bound for the restaurant. She testified that defendant brandished the gun during that entire time and that, before she and defendant departed, he gave the gun to Mareno. According to Ms. Brown, defendant told her that there were other persons involved in the crimes who were listening to police band radios and that, if she did anything to alert the police, the children would be harmed.
Shortly after defendant and Ms. Brown left in Ms. Brown's car, Mareno made the three children get inside Martin Brown's pickup truck. With Martin Brown driving, they drove to another location and parked in a parking lot. Martin Brown testified that, during the drive to the parking lot, Mareno saw a police car. At that point, Mareno pointed the gun at Johnny Templet and told Martin Brown that if the police stopped them for any reason Templet was "going home early."
Ms. Brown testified that, when she and defendant arrived at the restaurant, defendant stated that there was someone across the street, that the individual was armed with a 30.06 rifle equipped with a scope and that, if she did anything to alert the police, the individual would shoot immediately. That disclosure caused Ms. Brown to become frightened for her own safety. Ms. Brown unlocked the restaurant, and she and defendant entered the building. She telephoned Sonitrol, the building's security firm, and had them deactivate the security system. Ms. Brown unlocked the safe and removed several thousand dollars from it, which she gave to defendant. She also showed defendant her desk drawer which contained all the wrapped coins. Ms. Brown placed the money inside a cloth bag, containing loose coins, which she removed from underneath her desk and gave the bag to defendant.
After opening a second safe, which did not contain any money, Ms. Brown and defendant left the restaurant in her car and drove back to the Browns' residence. Upon arriving there, they observed that Martin Brown's pickup truck was gone and no one was home. Ms. Brown testified that defendant told her that his co-perpetrator had been instructed to leave the house if he became frightened. She and defendant left the Brown residence in her car again, and eventually they rendezvoused with the co-perpetrator and children at the parking lot.
*583 Both vehicles were then driven back to the Browns' residence. After all four victims were taken back inside the residence, the perpetrators tied up each of them using rope, duct tape and telephone cord. Defendant and his co-perpetrator then fled the scene in Ms. Brown's car. Within minutes, the victims managed to untie themselves. The offenses were reported to the police; and, subsequently, Ms. Brown's car was found only a short distance from her home.
Ms. Brown testified that, about three months before the offenses, David Carr had worked for her at Ralph and Kacoo's Restaurant and that, within minutes after the perpetration of the offenses had begun, she realized she knew defendant, because she recognized his voice. Similarly, Martin Brown testified that he had worked with defendant, that he knew defendant and that he recognized defendant's voice. Additionally, both Ms. Brown and Martin Brown identified defendant at the trial.
Detective Randy Keller of the East Baton Rouge Parish Sheriff's Office testified that he interviewed the victims and was given defendant's name. A warrant for defendant's arrest was obtained. Thereafter, at approximately 11:40 p.m. on July 1, 1986, Keller and other officers executed the warrant at defendant's residence in Long Beach, Mississippi. At the time of his arrest, defendant was advised of his Miranda rights. Shortly thereafter, defendant was removed from his residence and transported to the Gulfport Police Department and then to Harrison County Jail.
Keller and several other officers remained at defendant's residence with defendant's wife, Natalie Carr, who signed a form (S-1) conferring her consent to a search of the Carrs' residence and Ms. Carr's automobile. A search was then begun. During the course of the search, defendant telephoned home from the jail. Ms. Carr spoke to defendant and informed Detective Keller that defendant wanted to speak to him. Defendant told Keller he would tell him where the money could be found, if the police would get the money and leave his residence. Keller agreed to defendant's proposal, and defendant gave Keller specific instructions as to the location of approximately $8,000 in currency (from the robbery) which had been hidden inside an air conditioning duct in the Carrs' apartment. Prior to defendant's telephone conversation with Keller, the officers had already found and seized other monies taken during the robbery, i.e., a container of change from a closet in the residence and two canvas bags containing wrapped coins from the trunk of Ms. Carr's vehicle.
On July 2, defendant was transported from Mississippi to Baton Rouge and booked into the downtown jail. Shortly after midnight the next day, defendant was again advised of his constitutional rights; and he signed an advice of rights and consent to questioning form (S-3). Defendant then made a very detailed tape recorded confession to the instant offenses; and the state introduced the tapes (S-14 and S-15) into evidence at the trial.
ASSIGNMENT OF ERROR NO. ONE:
By means of this assignment, defendant contends that the trial court erred by denying his motion to suppress the physical evidence which was seized during the warrantless search of his apartment. He argues that his wife did not freely and voluntarily consent to the search of their apartment because of police threats and duress and her "extremely agitated mental condition." Defendant claims his wife was not informed she had the right to refuse to consent to the search. In addition, defendant argues that he did not freely and voluntarily consent to the search and that his statements over the telephone to Detective Keller telling him where to find the currency were not freely and voluntarily made. He asserts that Keller did not inform him of his constitutional rights during the telephone call and that the statements disclosing the location of the currency were made in exchange for Keller's promise to get the money, leave the apartment and stop upsetting his hysterical wife.
The evidence adduced at the suppression hearing disclosed that Ms. Carr signed S-1, a Long Beach Police Department permission to search form, in the presence of Detectives Keller and Debbie Yarborough *584 of the East Baton Rouge Parish Sheriff's Office and Long Beach Police Officers Lt. Linda Atterberry and Sgt. Robert Davis. Atterberry and Davis signed the form as witnesses.
Natalie Carr testified that she, defendant and their three-year-old son were in their apartment when defendant was arrested. She stated that she "kind of went berserkd," i.e., she was crying and wanted some answers from Detective Keller. Additionally, she claimed that Keller unplugged her telephone. She, however, admitted that she used the telephone to call some family members and that defendant telephoned her from jail. Ms. Carr also stated that a "woman" and "the detective from Baton Rouge" (an apparent reference to Keller) stayed with her after defendant was transported to jail, that they talked to her, that they tried to calm her down and that the detective talked to her mother (apparently on the telephone) and explained what was transpiring. Ms. Carr testified that the officers wanted to know where the money could be found and asked her permission to search the apartment. She admitted that she signed a permission to search form, but she denied that she read the form. She stated that the police told her that they could search the apartment "a lot better thanthan if someone else had toif someone else came back thatthen my house would probably be destroyed[.]" Additionally, Ms. Carr stated as follows: "The way they put it, they were going to do it anyway. I mean, it was just a matter of going and getting some people to come back, the right people to do it."
Defendant testified that Detective Keller asked for his permission to search the apartment but that he refused to give his permission. In reference to his telephone call home from jail following his arrest, defendant stated that his wife answered the telephone and that he asked to speak to Keller because of his concern for Ms. Carr. Defendant testified that he asked Keller why he was still at the apartment and that Keller responded that he was going to look for the money. Defendant further testified that he told Keller where the money could be found after making Keller promise to leave his wife alone.
Detective Keller testified that he remained at the Carrs' residence a total of approximately 45 minutes1 hour, including the initial "few minutes" it took to arrest defendant and remove him from the premises. Keller stated that, after defendant was taken away to be booked into jail, he remained at the Carrs' apartment. Ms. Carr was upset and crying because her husband had just been taken to jail. Keller stated that he advised Ms. Carr that the officers wanted to search her apartment. She agreed to permit the search of the apartment and her 1976 Chevrolet Malibu. Keller testified that he read the contents of S-1,[2] the permission to search form, to Ms. Carr. He stated that Ms. Carr's rights were explained to her and everyone was in agreement that she understood her rights. Keller further stated that Ms. Carr then signed S-1 in his presence and that of Lt. Atterberry, Sgt. Davis and Detective Yarborough. Keller did not recall Ms. Carr crying at the time she signed the form. He denied that he ever threatened to destroy the apartment or that he ever told her it would be easier to permit the search rather *585 than have him obtain a warrant, come back and tear up the house.
Detective Yarborough testified that Ms. Carr appeared to have signed S-1 freely. Although Ms. Carr was a "little upset" when she learned of her husband's arrest, according to Yarborough, Ms. Carr was not "hysterical or anything." However, Yarborough stated that Ms. Carr did cry "on and off." Yarborough did not recall that Keller or anyone in her presence had indicated to Ms. Carr that they would remain at the apartment until a search warrant was secured if Ms. Carr did not sign the permission to search form.
Sgt. Robert Davis testified that he neither threatened Ms. Carr to obtain her signature on S-1 nor did he see or hear anyone else so threaten Ms. Carr. Specifically, he did not hear anyone threaten to destroy the Carrs' apartment.
Lt. Linda Atterberry testified that she did not believe she was ever out of Ms. Carr's presence from the time she entered the Carrs' apartment to the point at which Ms. Carr signed S-1. Atterberry stated that she did not believe Ms. Carr was still crying when Keller sought Ms. Carr's permission to search. According to Atterberry, no one in her presence threatened Ms. Carr to get her to sign S-1; and Ms. Carr appeared to know what she was doing when she signed S-1. Atterberry stated that if Ms. Carr had objected to the search, she would have heard the objection; and she did not hear any objection.
In reference to the telephone call defendant made from jail to his home, Detective Keller testified that, during the course of the search, Ms. Carr answered the telephone and asked him if he was willing to talk to defendant who wanted to talk to him. In response, Keller went to the telephone and talked to defendant. Keller testified that defendant proposed that, to prevent any further trauma to Ms. Carr, he would tell Keller the location of the money if Keller would get the money and leave the apartment. Keller agreed to defendant's proposal, and defendant directed Keller to the location of the money which was found in the air conditioning duct. Keller stated that he did not advise defendant of his Miranda rights during the telephone conversation because he was not questioning defendant.
A search conducted without a warrant is presumably unreasonable unless justified by one of the specifically established exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Farber, 446 So.2d 1376 (La.App. 1st Cir.), writ denied, 449 So.2d 1356 (La.1984). A valid consent search is a well recognized exception to the warrant requirement, but the state has the burden of proving that the consent was valid in that it was freely and voluntarily given. Schneckloth v. Bustamonte, supra; Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); State v. Smith, 433 So.2d 688 (La.1983); State v. Wolfe, 398 So.2d 1117 (La.1981). Voluntariness is a question of fact to be determined by the trial court under the facts and circumstances of each case. These factual determinations are to be given great weight on appellate review. State v. Smith, supra. Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Bodley, 394 So.2d 584 (La.1981).
After a thorough review of the record, we find that under the totality of the circumstances Ms. Carr's consent to search was freely and voluntarily given. Hence, the search and seizures of evidence were lawful. We further find that defendant's proposal to Keller over the telephone (following his wife's consent to search) to disclose the location of the currency hidden in the air conditioning duct if Keller agreed to get the money and leave and Keller's acceptance of the proposal did not render the search for and seizure of the currency invalid. Although Keller admitted that he did not advise defendant of his Miranda rights during the telephone conversation, *586 the proposal was initiated by defendant, spontaneously and voluntarily. It was not the result of police questioning or other compelling influence. Hence, Miranda warnings were not required. See State v. Smith, 407 So.2d 652 (La.1981); State v. Jones, 386 So.2d 1363 (La.1980). The proposal, to disclose the location of the currency in exchange for a promise to leave the premises upon finding the currency, was not suggested by the police who had already secured a valid consent to search the apartment from defendant's wife. Under these circumstances, we conclude that defendant's disclosure of the location of the currency was the result of his free and voluntary consent made because of his desire to alleviate any emotional stress the officers' presence might have been having on his wife. Cf. State v. Weinberg, 364 So.2d 964 (La.1978). We further conclude that the disclosure amounted to defendant's own free and voluntary consent to search coupled with specific instructions which certainly hastened the conclusion of an already lawful search that was then underway. Hence, the trial court did not err in denying defendant's motion to suppress physical evidence.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. TWO:
By means of this assignment, defendant contends that the trial court erred by denying his motion to suppress his tape recorded confession (State Exhibits 14 and 15). Defendant asserts that he initially invoked his Fifth Amendment right to counsel at the time of his arrest; that, thereafter, he was subjected to interrogation during the trip from his apartment to the Gulfport Police Station, at which time he again invoked his right to counsel; and that his eventual confession at the detective office in Baton Rouge occurred without counsel having been made available to him, in violation of the rule in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Additionally, defendant claims that, following his invocation of the right to counsel, he neither initiated communications with the police nor waived his right to counsel in accordance with Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
The statements of an accused, whether exculpatory or inculpatory, when made during a custodial interrogation should be suppressed unless the accused is first advised of, and subsequently waives, his right to remain silent and his right to counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). La. Const. Art. I, § 13. When an accused asserts his right to counsel, the police must scrupulously honor the invocation of the right and interrogation must cease. State v. Harper, 430 So.2d 627 (La.1983); State v. Campbell, 461 So.2d 644 (La.App. 1st Cir. 1984), writ denied, 466 So.2d 1299 (La. 1985).
In Edwards v. Arizona, supra, the Supreme Court held that, when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights. The court further held that an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. State v. Arceneaux, 425 So.2d 740 (La.1983); State v. Campbell, supra.
Edwards set forth a "bright-line rule" that all questioning must cease after an accused requests counsel. Solem v. Stumes, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). In Smith v. Illinois, the Supreme Court stated:
In the absence of such a bright-line prohibition, the authorities through `badger[ing]' or `overreaching'explicit or subtle, deliberate or unintentionalmight otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for *587 counsel's assistance. 469 U.S. at 98, 105 S.Ct. at 494.
Furthermore, even when the accused initiates further communication, exchanges or conversations with the police (where reinterrogation follows), the prosecution still has the burden of showing that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. Smith v. Illinois, supra; Oregon v. Bradshaw, supra.
The evidence adduced at the suppression hearing reveals that the officers who participated in defendant's arrest included Detectives Keller and Yarborough, Long Beach Officers Atterberry and Davis, and Gulfport Officers Norman Patrick Pope, Jr., and Tom Johnson. Only Keller, Davis, Pope and Johnson gave testimony pertaining to the issue of defendant's alleged invocation of his right to counsel.
Defendant testified that, on the day of his arrest, the police came to his door and knocked. His wife answered the door. The police announced who they were, came in and disclosed that they had an arrest warrant for David Carr. Defendant testified that Detective Keller told him the charges for which he was being arrested and read him his rights. Defendant stated that he asked for an attorney several times and that "almost hollering ... [he] made [himself] heard." Defendant further stated that he was taken outside his home, and five to ten minutes later he was taken to the police station. From there he telephoned his wife at home and asked to talk to Detective Keller.
Defendant testified that he remembered being driven from Mississippi to Baton Rouge. When he and Mareno were placed inside the police unit at the start of the trip, Keller and Yarborough informed them that they were not going to discuss anything. After they arrived in Baton Rouge and defendant had been booked into jail, at about midnight he was awakened and taken from his cell to the detective office where he made his taped statement. Defendant testified that he did not initiate the questioning or say that he wanted to make a statement and that he asked for a lawyer not only at his arrest but also at the time he was being questioned. Defendant stated that, when Keller removed him from his cell prior to questioning, Keller told him "it would be easier on [him] if [he] would cooperate." However, from that time through questioning, the officers did not threaten or hit him.
Natalie Carr gave testimony corroborating defendant's testimony that he invoked his right to counsel. She stated that defendant asked for an attorney about three times before he was removed from the Carrs' apartment.
Keller testified that, following defendant's arrest, he next came into contact with defendant the day after the arrest when he and Yarborough took defendant and Mareno back to Baton Rouge in their police unit. After arriving in Baton Rouge, defendant and Mareno were booked into jail. Keller testified that first Mareno was removed from his cell and interviewed. Later, several hours after defendant was booked into jail, Keller removed defendant from his cell (around midnight) and brought him to the detective office. Defendant signed an advice of rights and consent to questioning form (S-3) witnessed by Keller and East Baton Rouge Parish Deputy Sheriff Freddie Fletcher. Keller testified that, after defendant was given his rights, defendant did not say that he wanted an attorney.
According to Keller, if defendant had asked for an attorney, he would not have questioned him. Keller stated that no one ever told him that defendant had informed any police officers that he wanted an attorney. Keller further stated that he did not hear or recall defendant saying, at the time of his arrest, he was not going to talk or say anything until he talked to an attorney. In additional testimony presented by the state on rebuttal, Keller stated that defendant did not ask him for an attorney between the time he removed defendant from his cell in Baton Rouge for questioning and when he returned defendant to jail after he confessed. In further rebuttal testimony, Keller stated emphatically that he never heard defendant ask for an attorney, including when defendant was arrested in *588 Mississippi. Keller stated that if defendant had screamed that he wanted an attorney, he would have heard it.
Keller denied that he promised defendant that it would be "better on him," that he would talk to the district attorney or that he would assure that defendant received better treatment if he made a statement. Keller also denied hearing anyone else make any such promises to defendant.
Sgt. Robert Davis testified that he participated in defendant's arrest. He entered defendant's apartment with Keller, and he did not leave the apartment before defendant was taken outside to be transported to jail. Davis stated that he never heard defendant ask for an attorney or scream for one. According to Davis, if defendant had screamed for an attorney, he would have heard it.
Sgt. Norman Patrick Pope, Jr., testified that, after defendant was placed under arrest and advised of his constitutional rights, defendant said he wanted to talk to an attorney. Pope stated that he and Detective Tom Johnson transported defendant to the Gulfport Police Station and that, on the way there, defendant reasserted his desire to talk to an attorney when he asked defendant if he was sure he did not want to talk to them. Pope testified that he and Johnson told defendant "okay." They then brought him to the station to prepare an arrest report, photograph and fingerprint defendant.
Detective Tom Johnson testified he entered defendant's apartment and participated in defendant's arrest. Johnson stated that Keller advised defendant of his constitutional rights and that he and Sgt. Pope transported defendant to the police station for processing before taking defendant to the Harrison County Jail. Johnson testified that he never heard defendant ask for an attorney or scream for one in the Carrs' apartment. He stated that he believed that, while he and Johnson were transporting defendant, defendant said he did not want to answer any questions; but he did not remember defendant saying that he wanted an attorney.
After all the evidence was introduced at the suppression hearing, the prosecutor and defense counsel argued their respective positions to the trial court. The prosecutor disputed that defendant had ever invoked his right to counsel at the time defendant was arrested at his residence, but the prosecutor expressly conceded that defendant invoked the right to counsel while Pope and Johnson were transporting defendant to the police station. The prosecutor argued that, after that invocation, there was no further questioning of defendant until after defendant reinitiated contact with the police and that defendant's subsequent confession was made after defendant waived his right to counsel. Defense counsel, on the other hand, argued that the testimony of defendant, Natalie Carr and Pope showed that defendant asserted his right to counsel while he was still at his apartment. Citing Smith v. Illinois, supra, defense counsel further argued that it was not enough to show that defendant subsequently initiated contact with the police without showing that there was also a valid waiver of the Sixth Amendment right to counsel.
In the instant case, the trial court failed to articulate any reasons for its ruling denying defendant's motion to suppress his confession. However, the ruling clearly reflects that the court found that there had been no violation of the "bright-line rule" of Edwards v. Arizona that all questioning must cease after an accused requests counsel. Consistent with that finding and because the prosecutor had conceded in his arguments to the court that defendant had invoked the right to counsel while being transported to the police station, it is apparent that the trial court accepted as credible the testimony of Officers Keller, Johnson and Davis that defendant had not (previously) invoked the right to counsel while inside his apartment and that the trial court rejected the testimony of defendant, Natalie Carr and Pope to the contrary. Furthermore, the trial court's ruling indicates that the court concluded that, after defendant invoked his right to counsel, and prior to any subsequent interrogation, defendant reinitiated contact with the police *589 and that he waived his right to counsel prior to confessing in conformity with Smith v. Illinois, supra, and Oregon v. Bradshaw, supra.
When reviewing such a trial court ruling based upon findings of fact, great weight is placed upon the determination of the court below because the trial court had the opportunity to observe the witnesses and weigh the relative credibility of their testimony. State v. Loyd, 425 So.2d 710 (La. 1982). We find that the evidence adduced at the suppression hearing amply supports the trial court's ruling.
The evidence showed that, after defendant invoked the right to counsel and before any subsequent interrogation, he reinitiated further communication, exchange or conversation with the police when he telephoned his wife from jail, and asked to speak to and actually spoke with Detective Keller. Contrary to defendant's contentions, that conversation evinced a willingness and desire on the part of the accused to open up a more generalized discussion relating directly or indirectly to the criminal investigation. See Oregon v. Bradshaw, supra. Finally, (S-3) the advice of constitutional rights and consent to questioning form signed by defendant immediately prior to his confession, together with the testimony of Detective Keller and defendant's own statements at the beginning of the interview at which he confessed, all show defendant waived his Sixth Amendment right to counsel before he confessed. Additionally, our review of the evidence convinces us that the trial court's finding that the confession was freely and voluntarily given is more than adequately supported by the testimony of Detective Keller and defendant's own testimony in that regard. Hence, the trial court did not err by denying the motion to suppress.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. SEVEN, NINE AND TWELVE:
By means of assignments seven and nine, defendant asserts that the trial court erred by allowing Daniel Brown and Johnny Templet to testify in regard to statements that defendant's co-perpetrator made while he and the Brown brothers and Templet were together in Martin Brown's pickup truck. In assignment twelve, defendant contends that the trial court erred by failing to grant his motion for mistrial on the basis that the state failed to establish a prima facie case of conspiracy to support the admission of the co-perpetrator's statements; and defendant concludes that for that reason the statements constituted inadmissible hearsay.
LSA-R.S. 15:447 provides that:
Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms any part of the res gestae is always admissible in evidence.
LSA-R.S. 15:448 provides as follows:
To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
Additionally, LSA-R.S. 15:455 provides as follows:
Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such a declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.
Herein, the testimony of the witnesses repeating statements of defendant's coperpetrator was admissible as part of the res gestae because the statements were made during the commission of one continuous criminal transaction.
Furthermore, the statements were clearly admissible under the statutory exception to the hearsay rule provided in *590 LSA-R.S. 15:455. See State v. Provo, 396 So.2d 1298 (La.1981); State v. Brumfield, 329 So.2d 181 (La.1976) (on rehearing). The evidence clearly established a prima facie case of conspiracy. In his confession, defendant stated that, prior to the commission of the offenses, they talked it over between themselves and decided the best way to do everything. They formulated an initial plan to abduct Ms. Brown on the outside of her home; and, later at her home, changed the plan when it was discovered that the initial plan was no longer feasible. According to defendant, his coperpetrator knew exactly what was going to happen. They had gone to the restaurant and looked it over and had found a place to meet if Mareno decided to remove the children from Ms. Brown's house. Consistent with the foregoing, Ms. Brown testified that, when she and defendant returned to her home from the restaurant and found no one home, defendant told her that the co-perpetrator had been instructed to leave the house with the children if he became frightened.
These assignments lack merit.
ASSIGNMENTS OF ERROR NOS. THIRTEEN AND FOURTEEN:
By means of these assignments, defendant contends that the trial court erred by denying his motion for post-verdict judgment of acquittal. He argues that the evidence was insufficient to convict him of armed robbery and aggravated kidnapping. More specifically, defendant claims that the state failed to prove armed robbery because no dangerous weapon was introduced into evidence and evidence that he displayed such a weapon was also lacking. In reference to the crime of aggravated kidnapping, defendant argues that a rational trier of fact could not have found that he forced the "victim" to submit to his demands as a condition to "her" release.[3]
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard, which was adopted by the Louisiana Legislature in enacting LSA-C.Cr.P. art. 821 pertaining to postverdict motions for acquittal based on insufficiency of evidence, is that the appellate court must determine whether or not the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Kennington, 515 So.2d 521 (La.App. 1st Cir.1987).

ARMED ROBBERY
Initially, we note that the state need not introduce into evidence the dangerous weapon(s) used during the commission of an armed robbery. State v. Brown, 481 So.2d 679 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986). A victim's testimony can sufficiently establish a robbery was committed with a dangerous weapon. State v. Marshall, 479 So.2d 598 (La.App. 1st Cir.1985).
LSA-R.S. 14:64 A. defines armed robbery as follows: "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."
Herein, the testimony of all four victims revealed that defendant was armed with a gun which he relinquished to his co-perpetrator when he departed the Brown residence with Ms. Brown, leaving the coperpetrator with the other victims. Ms. Brown and Johnny Templet also testified that the perpetrators were armed with a knife. In his taped confession, defendant stated that he left the gun with Mareno when he and Ms. Brown left the others at *591 her home to go to the restaurant. Defendant further stated that, at that time, he had only the knife with him.

AGGRAVATED KIDNAPPINGS
LSA-R.S. 14:44 defines aggravated kidnapping as follows:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.

* * * * * *
Herein, defendant and his co-perpetrator initially tied up Johnny Templet and the Brown brothers. Defendant informed Ms. Brown that they were going to the restaurant where he expected her to open the safe for him to get the money. Defendant also stated that his co-perpetrator would remain with the other victims until he got the money, and he threatened harm to the other victims if Ms. Brown failed to do as she was told. Defendant repeated that threat several times and made other threats to Ms. Brown, causing her to succumb to his demands. Later, after successfully completing the robbery, defendant and Ms. Brown rendezvoused with Mareno and the other captives. All of them then proceeded to the Brown residence, where defendant and his co-perpetrator bound all four victims and fled the scene with the stolen money.
Viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the armed robbery and each of the four counts of aggravated kidnapping charged in the indictment had been proved beyond a reasonable doubt.
Hence, these assignments are without merit.
ASSIGNMENTS OF ERROR NOS. FIVE, SIX, EIGHT, TEN AND ELEVEN:
By means of these assignments, defendant contends that the trial court erred by allowing the prosecutor to elicit irrelevant testimony from the victims concerning the effect the crime had on their lives. He argues that the testimony was highly prejudicial. The state counters that the evidence was adduced to establish the use of force, an element of the crime of aggravated kidnapping.
The record reflects that assignments five and six pertain to the state's question as to the effect the incident had on Ms. Brown's family and her answer in response that the effect was traumatic, particularly as to her youngest son, Daniel. She elaborated that Daniel was terrified by the incident and had to be placed under a psychologist's care for about three months. Ms. Brown stated that Daniel still cannot stay home alone; and, for a long time, (apparently when not accompanied by someone) he would not even walk from one room to another. Assignment eight relates to the prosecutor's question to Daniel Brown as to how he felt while the crimes were being committed and his answer that he felt scared. The record shows that assignment ten concerns another question the state propounded to Daniel Brown, i.e., if he had any problem after the incident, and his response that his mother thought he was going crazy and sent him to a psychiatrist. Lastly, assignment eleven pertained to the prosecutor's question to Martin Brown as to how he felt being tied up with his mother and brother and Martin's answer that he did not like it very much and that it didn't last too long because he untied himself within about five minutes.
Defendant's argument is without reversible merit. Relevant evidence is evidence tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent. LSA-R.S. 15:441; State v. Davenport, 445 So.2d 1190 (La.1984). The *592 standard of relevancy adopted by our statutory evidence rules is based on logic and experience as opposed to a theory of a legal minimum of probative value adopted by some courts and championed by Wigmore. So long as the proffered evidence has a tendency to make a consequential fact more or less probable, the "logical" relevancy test is satisfied. Id. Consequently, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Id. Although the relevancy of the state's questions is not very clear, the answers given in response were not unduly prejudicial to defendant. The testimony was of low probative value and could hardly be considered as having influenced the jury's verdicts in this case. Cf. State v. Prestridge, 399 So.2d 564 (La.1981).
These assignments lack merit.
ASSIGNMENT OF ERROR NO. FIFTEEN:
By means of this assignment, defendant asserts that his sentences for armed robbery and aggravated burglary are excessive and that the trial court erred by failing to comply with the sentencing guidelines of LSA-C.Cr.P. art. 894.1[4]
Article I, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So. 2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Telsee, 425 So.2d 1251 (La.1983). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, supra. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Abercrumbia, 412 So.2d 1027 (La.1982); State v. Johnston, 476 So.2d 551 (La.App. 1st Cir. 1985).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Christy, 509 So.2d 829 (La.App. 1st Cir.), writ denied, 513 So.2d 296 (La.1987). The trial court need not recite the entire checklist found in LSA-C. Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645 (La.1984). Even when the trial court has not complied with LSA-C.Cr.P. art. 894.1, this Court need not remand the case for resentencing, unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Davis, supra.
Aggravated burglary is punishable by imprisonment at hard labor for not less than one nor more than thirty years. LSA-R.S. 14:60. Armed robbery carries a penalty of imprisonment at hard labor for not less than five nor more than ninety-nine years, without benefit of parole, probation or suspension of sentence. Herein, defendant was sentenced to twenty years at hard labor for aggravated burglary; and he received a sentence of forty-five years at hard labor, without benefit of parole, probation *593 or suspension of sentence, for armed robbery. The trial court ordered that these sentences and defendant's sentences of life imprisonment for the aggravated kidnappings run concurrently with each other.
At sentencing, the trial court pointed out that the instant case was one of the saddest cases with which the court found itself faced, noting there were only limited sentencing alternatives available in this case. The court stated that it was impressed not only by the seriousness of the offenses but also by the fact that defendant had no record of any prior offense. Referring to the testimony it had heard, the trial court stated that, in its opinion, defendant took measures to ensure that no one would be hurt or tried to do so.
In imposing defendant's sentences, the trial court stated that, in accordance with LSA-C.Cr.P. arts. 894.1, and 893, confinement was appropriate. The court noted that it had no discretion in imposing the sentences for the aggravated kidnappings which carried mandatory life sentences. The court stated that because of the seriousness of the offenses defendant was in need of correctional treatment in a custodial environment that could be provided most effectively by commitment to a correctional institution. The court stated that any lesser sentences would deprecate the seriousness of the offenses, noting that several juveniles were victims of the crimes.
The trial court, in an apparent reference to the content of the presentence investigation report, noted that Johnny Templet's mother stated that Johnny has experienced emotional problems dealing with the instant offenses and that, although she feels he is in need of counseling, she does not have the necessary funds to pay for counseling. The court noted that Daniel Brown had received psychological counseling for several months and that, at trial, Daniel stated he still had emotional problems resulting from these crimes. The court further noted that both Ms. Brown and Martin Brown had also experienced problems as a result of the offenses.
In addition to the mitigating factors initially noted by the trial court, the court stated that it felt defendant had shown remorse for his crimes and that defendant would like to compensate the victims. The court concluded sentencing by stating that the sentences it imposed were appropriate in this case, noting that it had considered the factors in mitigation including those mitigating factors disclosed at trial and in the presentence investigation report.
We find that the trial court more than adequately complied with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1, and the sentences imposed are not apparently severe in relation to defendant or the offenses committed. Under the circumstances of this case, we are unable to say that the trial court abused its discretion in imposing the instant sentences. Thus, we do not find the sentences to be excessive.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Pursuant to a plea bargain with Anthony Shawn Mareno, the state reduced the charge in Count I to attempted aggravated kidnapping and nolle prosequied the charges in Counts II-IV as to him; and Mareno pled guilty to the attempted aggravated kidnapping and guilty as charged in Counts V and VI. Mareno reserved his right to appeal the trial court's denial of his motion to suppress. See State v. Crosby, 338 So.2d 584 (La. 1976). Following imposition of sentences, on appeal, we affirmed Mareno's convictions and sentences. See State v. Mareno, 530 So.2d 593, (La.App. 1st Cir.1988).
[2] S-1 provides, in pertinent part, as follows:

I, Natalie Carr, have been informed by Lt. Randy Keller and Cpl. Debbie Yarbrough who made proper identification as (an) authorized law enforcement officer(s) of the East Baton Rouge Parish Sheriff's Office of my CONSTITUTIONAL RIGHT not to have a search made of the premises and property owned by me and or under my care, custody and control, without a search warrant.
Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named officer(s) to conduct a complete search of the premises and property, including all buildings and vehicles, both inside and outside of the property located at 2012 W. 2nd St. Ap. 11-A Long Beach, Mississippi[.]
The above said officer(s) further have my permission to take from my premises and property, any letters, papers, materials or any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation.
This written permission to search without a search warrant is given by me to the above officer(s) voluntarily and without any threats or promises of any kind ...
[3] We note that defendant's argument alleging insufficiency of the evidence to convict him of kidnapping is couched in terms of a single kidnapping of a female victim. However, we assume defendant intended to challenge all four of his convictions for aggravated kidnapping on the basis of insufficiency of the evidence; and, accordingly, we choose to address his allegation as to all four aggravated kidnappings.
[4] In brief, defendant concedes that the four concurrent sentences he received for his aggravated kidnapping convictions of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence were mandated by LSA-R.S. 14:44. He states that, therefore, the trial judge was afforded no discretion; and he limits his allegations of excessiveness and failure to comply with LSA-C.Cr.P. art. 894.1 to the sentences he received for armed robbery and aggravated burglary.