GUIDRY, J.
| ¡.The defendant, Wendell Wesley, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. Prior to trial, he moved to suppress his second tape-recorded interview. Following a hearing, the trial court denied the motion to suppress, and the defendant applied to this court for supervisory relief concerning the ruling, but the writ application was denied. State v. Wesley, 10-0695 (La.App. 1st Cir.4/20/10) (Hughes, J., dissenting) (unpublished). Following a jury trial, the defendant was found guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He now appeals, contending that the trial court erred in denying the motion to suppress. For the following reasons, we affirm the conviction and sentence.
FACTS
On February 2, 2007, between 10:00 p.m. and 10:30 p.m., the victim, James Bethley, was shot to death in Bayou Goula, Louisiana. He suffered four gunshot wounds. The trajectory of the shots was from top-to-bottom, indicating he could have been shot while he was “down.”
Leo Young Jackson testified at trial. He was the victim’s brother, and the victim helped to raise him. Jackson denied killing the victim and identified the defendant as the killer at trial. According to Jackson, on the night of the incident, he met the defendant at Jackson’s house and then followed the defendant to his house, where they talked. Thereafter, another of Jackson’s brothers, Jonathan, wanted to go to White Castle to look for the victim, so Jackson drove Jonathan to White Castle. The men were unable to locate the victim in White Castle, and Jackson drove Jonathan home.
While driving, Jackson saw the defendant talking to his cousin by the fire station, so Jackson parked his truck and walked over to the men. Thereafter, Jackson 13gave the defendant a ride to the store. According to Jackson, while he and the defendant were talking in the parking lot of the store, the defendant pulled out a revolver and put it on the icebox. The defendant then put the gun back “in his pants area,” and he and. Jackson drove back down the street.
While Jackson and the defendant were driving, they saw the victim. So Jackson drove to Jonathan’s house and told him that the victim was outside. Jonathan said he would talk to the victim the next day. Jackson then drove the defendant back to Jackson’s house.
*57 While Jackson was taking some trash to the street, he saw the defendant and the victim talking to each other. According to Jackson, he heard the defendant telling the victim, “you owe me, you going to pay me.” The victim told the defendant “it was something from last year and that he [the victim] didn’t give it to him [the defendant] then and that meant he [the defendant] wasn’t going to get it.” Jackson testified that the defendant then pulled out his gun, pointed it at the victim, “the gun went click,” and the victim ducked. When the victim “came back up,” the defendant shot him, and the victim grabbed his chest and dropped to the ground. Jackson also grabbed his chest, and started running. He heard the victim state, “[y]ou going to let it end like this?” He then heard two more gunshots.
In a December 2, 2007 statement, Amber Wesley, the defendant’s aunt, stated she had heard a gunshot on February 2, 2007, at 10:32 p.m., went outside, and saw a black male standing over a man and he “continued to shoot 3 more times.” In her written statement, Amber Wesley stated that the shooter was wearing “a dark colored hood.” At trial, however, she claimed the shooter was wearing a dark colored shirt. She also claimed that if the defendant had been the shooter, she would have recognized him.
On the morning following the shooting, a black-hooded sweatshirt and muddy shoes were recovered from the front porch of the defendant’s home. Carrie Cormier, |4the defendant’s mother, identified the shoes and sweatshirt as belonging to the defendant. At trial, however, she claimed she had never seen the shoes or sweatshirt before. The defendant also testified at trial. He denied killing the victim. He claimed he finished work at approximately 4:30 p.m. on the day of the incident and then went to a truck stop, purchased a beer, and drove towards his home. Prior to arriving at his house, he parked his truck and walked to the home of his cousin, Germaine Wesley. Germaine was about to leave to go to a club, so the defendant walked back to his house. He ate beans and fried chicken with his mother and stepfather and then stepped out to smoke a cigarette. According to the defendant, while he was smoking the cigarette, Jackson drove up and spoke to him for approximately thirty minutes about going fishing the next day. The defendant claimed Jackson left when Jonathan Beth-ley called him away. The defendant claimed he then walked to his grandmother’s house and also ate chicken with her. He claimed that as he was leaving his grandmother’s house, he saw his brother, Steve, and then went to the store and purchased another beer and some more chicken. The defendant claimed that at approximately 9:00 p.m., he played dice for one hour to one and one-half hours with Germaine Little, Mack Dolittle, Jason Favorite, and “Kool-Aid.” The defendant stated he then made repairs to the brake calipers on his truck. Just as he completed working on his truck, he said Jackson drove up and stated, “[M]an, what should I do,” but the defendant ignored him, and Jackson sped away. The defendant claimed he next saw police cars driving by, and when he arrived at his house, he heard the police were looking for him.
MOTION TO SUPPRESS STATEMENTS
In his sole assignment of error, the defendant argues the trial court erred in denying his motion to suppress statements because his grandmother, rather than he, initiated communication with the police after he invoked his right to counsel.
|fiWhen a trial court denies a motion to suppress, factual and credibility *58 determinations should not be reversed in the absence of a clear abuse of the trial court’s discretion, i.e., unless such ruling is not supported by the evidence. See State v. Welch, 11-0274, p. 1 (La.4/29/11), 60 So.3d 603; State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280-81. However, a trial court’s legal findings are subject to a de novo standard of review. See State v. Hunt, 09-1589, p. 6 (La.12/1/09), 25 So.3d 746, 751.
In Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates “in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.” Edwards v. Arizona, 451 U.S. 477, 481-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981), reconfirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1884-85; see Maryland v. Shatzer, — U.S. -, -, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010).
When a defendant invokes his Miranda right to counsel, the admissibility of his subsequent confessions under federal law is to be determined by a two-step analysis: it first must be asked whether the defendant “initiated” further conversation, and if the answer is yes it must be inquired whether the defendant waived his right to counsel and to silence, “that is, whether the purported waiver was knowing and intelligent ... under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the ^authorities.” State v. Abadie, 612 So.2d 1, 5(La.), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044-45, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983)). See also La. R.S. 15:452 (no arrestee “shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime.”). However, the accused may initiate further conversation with the police through another person. See State v. Carr, 530 So.2d 579, 589 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La.1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989) (“after defendant invoked the right to counsel and before any subsequent interrogation, he reinitiat-ed further communication, exchange or conversation with the police when he telephoned his wife from jail, and asked to speak to and actually spoke with [a detective] .... [T]hat conversation evinced a willingness and desire on the part of the accused to open up a more generalized discussion relating directly or indirectly to the criminal investigation.”).
During the early hours of February 3, 2007, the defendant was twice questioned by detectives at the police department. He requested counsel during the first interview. Prior to trial, he moved to suppress his second tape-recorded interview because he requested counsel during his first tape-recorded interview.
Iberville Parish Sheriffs Office Chief of Detectives Blair Favaron testified at the hearing on the motion. During the early hours of February 3, 2007, he and Detec *59 tive Ernest Williams[1] were investigating the murder of the victim. The defendant was a suspect in the shooting, and “the word had gotten out” that the police were looking for him. Thereafter, the defendant came to the police department with his grandmother, Barbara Wesley, and his stepfather, Joe Cormier, who was a jailer with the Sheriffs Office. Detective Favar-on identified the Miranda warnings read to the defendant at 2:15 a.m. The defendant indicated he was nineteen years old and |7had a twelfth-grade education. Thereafter, he indicated he understood his rights and invoked his right to counsel. Accordingly, Detectives Favaron and Williams ended the interview.
Detectives Favaron and. Williams exited the interview room and informed Barbara Wesley and Joe Cormier that the defendant wanted an attorney, and thus, they could not talk to him. Barbara Wesley stated, “I would like to talk to him,” and the detectives allowed her to talk to the defendant alone in the interview room. Approximately five minutes later, Barbara Wesley came out of the room and informed Detectives Favaron and Williams that “he wants to talk to [Detectives Favaron and Williams] now.”
Thereafter, Detectives Favaron and Williams went back into the interview room, readvised the defendant of his Miranda rights and, after he waived those rights at 2:20 a.m., interviewed the defendant. Detective Favaron indicated no offer, threat, or coercion was used against the defendant to make him waive his rights. The defendant denied any involvement in the shooting of the victim. He claimed he had not seen the victim that night. He claimed he had seen Jackson at the defendant’s house, sometime after the defendant finished work at 4:00 p.m. The defendant claimed he was at home from approximately 4:30 p.m. to 12:00 a.m. and sat with his “mama” and stepfather and “ate chicken all night.” He claimed he was at Matthew Little’s house from 12:00 a.m. to 1:00 a.m. and at the time the police responded to the shooting. He denied ever owning a gun. He agreed his grandmother had told him “[o]nly Jesus can help you.” During the second interview, the defendant never indicated he did not want to talk to the detectives or that he wanted an attorney.
The State did not dispute that the defendant was subjected to custodial interrogation or that he invoked his right to counsel in the first interview. The State argued that the defendant thereafter reinitiated further communication with the detectives through his grandmother, who advised the detectives, “[the defendant] 18wants to talk to you now,” and everything that occurred subsequently, including the defendant being readvised of his Miranda rights and answering affirmatively that he wished to talk to the detectives, corroborated that fact. The defense argued that only five minutes passed between the two interviews, and the defendant never left the interrogation room. The trial court denied the motion to suppress. The court found that the uncontroverted evidence indicated the defendant had reinitiated further conversation with the police. Further, the court noted, based on the defendant’s highest level of education, the fact that he initially stated he wanted an attorney, and the fact that he subsequently waived his right to an attorney, the defendant freely, knowingly, and intelligently waived his rights, and his answers were freely and voluntarily given without coercion, force, or threats.
Barbara Wesley did not testify at the suppression hearing. She did, however, *60 testify at trial.[2] In response to questioning by the defense, she stated that she did not tell the defendant what to tell the detectives. She said she told him that he should talk to the detectives and tell them what happened; and she told him to tell the truth.
There was no error or abuse of discretion in the trial court’s denial of the motion to suppress. The defendant reinitiated conversation with the detectives through his grandmother and, thereafter, placed his initials on a Miranda warning/waiver form indicating “having been read these rights,” he “wish[ed] to make a statement or talk to [the police] now.” The totality of the circumstances indicate that the defendant knowingly and intelligently waived his rights.
Accordingly, based on our review of the record and the applicable law, we find this assignment of error is without merit and therefore affirm the defendant’s conviction for second degree murder and sentence.
CONVICTION AND SENTENCE AFFIRMED.

. Detective Williams died prior to the hearing on the motion to suppress.

. In determining whether the ruling on the motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may also consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979).