EDWARDS, Judge.
Defendant was arrested and charged with unauthorized use of a movable with a value in excess of $1,000.00, in violation of LSA-R.S. 14:68. He filed a motion to suppress physical evidence seized at the time of his arrest. After a hearing the trial judge denied the motion to suppress, and this court denied defendant’s application for writs. Thereafter, on defendant’s application, the Louisiana Supreme Court granted a writ and ordered the case remanded to this court for briefing, argument, and opinion.
On February 22, 1984, at about 9:30 p.m., SNAP (Special Narcotics Action Patrol) officers of the Baton Rouge Police Department observed four black men standing by a pick-up truck in the parking lot of the Blue Rose Cafe in Baton Rouge. The SNAP program is the result of a crackdown by the Baton Rouge City Police Department on the possession of weapons and narcotics, whereby off-duty police officers patrol lounges and street corners checking for drugs and weapons. According to Detective Paxiao, the officers approached the group and requested identification because they were “hanging around one car.” Officer Paxiao testified that after verifying the identification of defendant’s three companions and sending them inside, he kept defendant outside to check his I.D.[1] He told defendant to stand by the police car while his partner verified the I.D. Defendant had told the officers that he had come to town that day on the bus. While they were waiting for the I.D. check, however, another man approached Officer Paxiao and told him that defendant had arrived there in a particular car, which the man pointed out, and that defendant had stolen that car. At that point, as Officer Paxiao turned to look at defendant, he saw him throw something under the police unit. The officers retrieved a set of car keys which were later discovered to fit a stolen vehicle.
Defendant contends that the keys must be suppressed because they were illegally seized. Defendant abandoned the keys when he threw them under the police unit, and property “abandoned without any prior unlawful intrusion into the citizen’s right of freedom from governmental interference ... may be lawfully seized.” State v. Chopin, 372 So.2d 1222, 1224 (La.1979). The question whether the keys must be suppressed then hinges on whether the police had made an unlawful intrusion into defendant’s right of freedom from govern *1271 mental interference before he threw the keys under the police unit.
At the time he abandoned the keys, he was not under arrest. He was, however, awaiting the police verification of his identification. If the police I.D. check was legal, then there was no prior unlawful intrusion into defendant’s right to be left alone, and the keys are admissible as evidence. On the other hand, if the I.D. check was not legal, there was a prior unlawful intrusion into defendant’s right to be left alone, and the keys were illegally seized, and hence inadmissible.
The Fourth Amendment protects citizens against unreasonable searches and seizures, but not every encounter between a citizen and a policeman involves a “seizure.” Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). “[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has ‘seized’ that person.” Id. at 16, 88 S.Ct. at 1877. “As long as a reasonable person would feel free to disregard the encounter and walk away, there has been no ‘seizure.’ ” State v. Ossey, 446 So.2d 280, 285 (La.1984 (quoting Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)); State v. Bel-ton, 441 So.2d 1195, 1199 (La.1983), cert. denied, — U.S. -, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Furthermore, if a citizen after being approached by law enforcement officers consents to stop and answer questions, there is no Fourth Amendment violation. “If there is no detention — no seizure within the meaning of the Fourth Amendment — then no constitutional rights have been infringed.” Florida v. Royer, 103 S.Ct. at 1324.[2]
Detective Paxiao testified that he requested defendant’s I.D. Even if we assume that defendant voluntarily gave his I.D. to the police officer, and therefore that the initial stage of the encounter was consented to by defendant, when Officer Pax-aio told defendant to stand by the police car while his partner verified defendant’s I.D., defendant no longer had any choice in the matter. Although there is no evidence that defendant resisted, a reasonable person, upon being told to stand by a police car while his identification is being verified would not feel free to disregard the encounter and walk away.[3] We therefore conclude that at the time defendant abandoned the keys, he was seized within the meaning of the Fourth Amendment and, therefore, that the objective standards for Fourth Amendment protection apply.
“A law enforcement officer may stop a person in a public place whom he reasonably believes is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.” LSA-C.Cr.P. art. 215.1 A. The right of law enforcement officers to make investigatory stops of people reasonably suspected of criminal conduct is recognized as well by state and federal jurisprudence. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Ossey, 446 So.2d 280, 285-86 (La.1984); State v. Belton, 441 So.2d 1195, 1198 (La.1983). Rea sonable cause for an investigatory stop is something less than probable cause, but *1272 the officer must have articulable knowledge of particular facts, which in conjunction with reasonable inferences drawn therefrom is sufficient to provide reasonable grounds to suspect the party involved of past, present or imminent criminal activity.” State v. Bickham, 404 So.2d 929, 931 (La.1981) (citing State v. Wilson, 366 So.2d 1328, 1331 (La.1978)). The officer must have sufficient knowledge of facts and circumstances to justify an infringement on the individual’s right to be left alone.
In State v. Bickham, the court concluded that there was sufficient cause for an investigatory stop because the officer knowing that an armed robbery had been committed by a bearded black man, saw a bearded black man driving away from the scene of the crime at about 2:00 a.m. when there were few vehicles on the road. In contrast, however, are the cases of State v. Chopin, 372 So.2d 1222 (La.1979), and State v. Scott, 412 So.2d 988 (La.1982), in which the court held there was not reasonable cause for an investigatory stop.
In Chopin a man walking in a well-lighted, well-traveled area and carrying a brown paper bag, became nervous when he saw the policemen and ran when they stopped in front of him. The court pointed out that the policemen had no information connecting the defendant to criminal activity, that he was not committing a crime at the time, and that the police had no reason to suspect he was about to commit a crime.
In Scott a policeman stopped a black New Orleans Sanitation Department employee and asked to see his I.D. at about 5:00 p.m. near Iberville and Royal Streets in the French Quarter after observing him walking back and forth on the sidewalk for ten to fifteen minutes. The policeman testified that he suspected defendant had committed a crime or was planning one because he walked in a suspicious manner, seemed nervous, talked very fast, and volunteered an explanation for his presence without being asked. The court noted, however, that the Scott case did not fit the mold of the typical cases where reasonable suspicion to stop had been found, and emphasized that walking up and down the sidewalk for ten to fifteen minutes, seeming nervous, talking fast and volunteering an explanation for his presence were not reasons to suspect he may have been a criminal.
In the instant case, Officer Paxaio did not even claim that he stopped defendant because he believed defendant had committed, was committing, or was about to commit a crime. He asked for defendant’s I.D. because defendant and his companions were “hanging around vehicles.” Yet he admitted that it was not unusual to see groups of black men in that largely black residential area. Officer Paxaio said that when the officers approached the group, “the four of them [were] hanging around the vehicle, hanging all over it, ..., standing by the window. We could only see the right side.... We just stopped to see what they were doing hanging out there and either send them inside the bar or leave.” Record at 28.
Defendant was stopped because he was standing around a pick-up truck in a parking lot of a cafe which was open for business. He was not suspected of any criminal activity. The officers had no knowledge of any prior crimes committed by defendant. There was no indication of any criminal act at the time by defendant. Accordingly, the state failed to establish reasonable grounds for an investigatory stop, and the evidence seized pursuant thereto must be suppressed. The trial court is hereby ordered to grant the motion to suppress.
REVERSED.

. Apparently defendant’s I.D. check took longer than that of his companions because he was from out of town.

. There is no majority opinion in Royer. Nonetheless, Justice Blackmun, dissenting, expressly endorsed the plurality’s Fourth Amendment seizure standard, see 103 S.Ct. at 1332, thus giving it majority approval.

. In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Court held unconstitutional a Texas statute which made it a crime to refuse to give one’s name and address to an officer who had lawfully stopped him. Uniformed officers stopped a man walking in an alley and asked him to identify himself. When he refused and angrily said they had no right to stop him, they frisked him and arrested him. Although it was not necessary for the Court to pinpoint the exact time of seizure, since the defendant refused to show his I.D. throughout the encounter, the Court said that "when the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment.” Id. at 52, 99 S.Ct. at 2641. In United States v. Mendenhall, 446 U.S. 544, 556, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980), however, two members of the Court said of Brown that there was no seizure until the frisk.