530 So.2d 593 (1988)
STATE of Louisiana
v.
Anthony Shawn MARENO.
No. KA871447.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
Writ Denied November 28, 1988.
*594 Bryan Bush, Dist. Atty., Baton Rouge, by Richard Sherburne, Asst. Dist. Atty., for plaintiff/appellee.
Public Defender, Baton Rouge, for defendant/appellant.
Before COVINGTON, SAVOIE and LeBLANC, JJ.
LeBLANC, Judge.
Defendant, Anthony Shawn Mareno, and his co-perpetrator, David L. Carr, were charged in a single grand jury indictment consisting of six counts: (Counts I-IV) aggravated kidnapping, (Count V) armed robbery and (Count VI) aggravated burglary, violations of LSA-R.S. 14:44, 64 and 60, respectively.[1] Defendant subsequently withdrew his original pleas of not guilty and not guilty by reason of insanity to those charges. Pursuant to a plea bargain entered into with defendant, the state reduced the charge in Count I to attempted aggravated kidnapping and nolle prosequied the charges in Counts II-IV; and defendant pled guilty to the attempted aggravated kidnapping and guilty as charged in Counts V and VI, reserving his right to appeal the trial court's denial of motions to suppress physical evidence and confessions. See State v. Crosby, 338 So.2d 584 (La. 1976). Subsequently, the trial court sentenced defendant to terms of imprisonment at hard labor as follows. For his convictions of attempted aggravated kidnapping and armed robbery, defendant received sentences of forty-five years each, without benefit of parole, probation or suspension of sentence. For aggravated burglary, defendant was sentenced to thirty years. The trial court ordered that all three sentences run concurrently with each other. Defendant has appealed, urging seven assignments of error:
1. The trial court erred by denying the motion to suppress David L. Carr's confession.
*595 2. The trial court erred by denying the motion to suppress the physical evidence seized during the search of David L. Carr's apartment.
3. The trial court erred by failing to suppress defendant's statements.
4. The trial court erred by denying defendant's motion to suppress physical evidence.
5. The trial court erred by denying a motion to change venue.
6. The trial court erred by denying a motion for individual voir dire.
7. The trial court erred by imposing excessive sentences and failing to comply with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1.
In brief, defendant expressly abandoned assignments five and six. We note, however, that those assignments were not included in defendant's Crosby reservation; and, hence, those alleged errors were waived in any event. See State v. Crosby, supra.
The record reflects that the instant offenses occurred in Baton Rouge on June 30, 1986. Defendant and David L. Carr forcibly entered the home of Ms. Laura Lynn Brown, the general manager of Ralph and Kacoo's Restaurant. The perpetrators were armed with a gun and a knife.
Ms. Brown, her two sons and a friend of Ms. Brown's younger son were all asleep at the time the home was entered by the perpetrators. The three children were tied up. Defendant was left at the Browns' residence with the children, while Carr forced Ms. Brown to take him in her car to the restaurant. After forcing Ms. Brown to open the restaurant safe and taking the money from the safe together with other monies, Carr returned with Ms. Brown to her home. At that time, they observed that no one was at home and Ms. Brown's older son's pickup truck was gone. However, in accordance with a contingency plan of the perpetrators, Carr and Ms. Brown met defendant and the children at another location, parked in a parking lot. From that location, all of them returned to Ms. Brown's home. The children and Ms. Brown were tied up, and the perpetrators fled the scene.
Detectives Randy Keller and Debbie Yarborough of the East Baton Rouge Parish Sheriff's Office began investigating the instant offenses on the day they were committed. When the detectives interviewed the victims, Ms. Brown and her older son informed the officers that they recognized defendant's co-perpetrator as being David L. Carr.
On the following day, July 1, Carr telephoned Detective Keller's office from Mississippi after he apparently became aware of Keller's investigation of the crime. Keller spoke to Carr over the telephone, informing Carr that he needed to talk to him and that either Carr could come to Baton Rouge or Keller could go to Mississippi. Carr stated that he needed to think the matter over and would call back. Minutes later, Carr telephoned the detective's office again and disclosed that he was not coming to Baton Rouge and that, on the day of the offenses, he and defendant were together.
That same day, the detectives learned that defendant worked at Shoney's Restaurant in Gulfport, Mississippi. Keller telephoned Gulfport Police Officer Norman Patrick Pope, Jr. Keller provided Pope with a description of Carr's co-perpetrator, i.e., an individual 5'7"5'8", with an olive complexion, medium build, brown hair and a "kind of hispanic appearance." Keller asked Pope to see if defendant fit that description. Additionally, Keller asked Pope to determine whether or not defendant was with Carr during the time frame within which the instant offenses were perpetrated or if defendant had any knowledge of Carr's whereabouts during that time frame.
Pope determined that defendant worked at the Shoney's Restaurant located on Highway 90 in Gulfport. He went to that location and talked to the restaurant's manager. The manager told him defendant was at work and brought him into an area of the restaurant which she closed off for Pope to interview defendant. Pope advised defendant of his Miranda rights and informed him that there had been a robbery *596 in Baton Rouge and that he was assisting in the investigation of the offense. When questioned in regard to his whereabouts on June 30, defendant stated that he and Carr had been together that night; that they had gone to some places in North Gulfport to buy marijuana; and that, afterwards, they went to Carr's apartment in Long Beach, Mississippi, where they stayed until the next morning. Defendant specifically denied he had been in Baton Rouge and that he had participated in a robbery.
After interviewing defendant, Pope telephoned the Baton Rouge office of Keller and Yarborough at about 6:30-7:00 p.m. Pope disclosed to the detectives that defendant fit the general description that had been given to him of Carr's co-perpetrator; and he told them what defendant had stated to him.
After receiving the above information from Pope, and after obtaining a warrant for Carr's arrest, Keller and Yarborough traveled in their police unit from Baton Rouge to Gulfport. They met Pope in Gulfport and proceeded with him to the Shoney's Restaurant, arriving there at about 9:45 p.m. Pope talked to the restaurant manager again. Defendant's own testimony revealed that, when the officers entered the restaurant, he was behind the "cooking line," that the manager asked him to speak to the officers and that, at that point, he had no objection to talking to the officers. Defendant and the officers seated themselves in the same closed off portion of the dining area that Pope had used for his initial interview with defendant. The testimony of several of the witnesses testifying at the suppression hearing revealed that the closed off area had been formed by positioning a sliding door across the dining room. The manager had provided them that area in order that they could talk away from the general public.
Pope introduced defendant to Keller and Yarborough. Keller first advised defendant of his Miranda rights. He then explained what crimes were being investigated and disclosed that he had an arrest warrant for David L. Carr. Shortly thereafter, defendant confessed to the crimes; and, at that point, Keller first advised defendant that he would be detained, that an arrest warrant would be prepared and that he would be taken to the Gulfport police station. The entire interview lasted approximately twenty minutes.
Thereafter, at approximately 11:40 p.m., Keller and the other officers executed the warrant for David L. Carr's arrest at Carr's residence in Long Beach, Mississippi. At the time of his arrest, Carr was advised of his Miranda rights; and, within minutes of his arrest, Carr was removed from his residence, transported to the Gulfport Police Department and then to the Harrison County Jail.
Keller and several other officers remained at Carr's residence with Carr's wife, Natalie Carr, who signed a form (State Exhibit 1) conferring her consent to a search of the Carrs' residence and Ms. Carr's automobile. A search was then begun. During the course of the search, Carr telephoned home from the jail. Ms. Carr spoke to her husband and informed Detective Keller that David Carr wanted to speak to him. Keller agreed to talk to Carr; and Carr told Keller he would tell him where the money could be found, if the police would get the money and leave his residence. Keller agreed to the proposal, and Carr gave Keller specific instructions as to the location of approximately $8,000 in currency (from the robbery) which had been hidden inside an air conditioning duct in the Carrs' apartment. Prior to David Carr's telephone conversation with Keller, the officers had already found and seized other monies taken during the robbery, i.e., a container of change from a closet in the residence and two canvas bags containing wrapped coins from the trunk of Ms. Carr's vehicle.
On the following day, July 2, Keller and Yarborough transported defendant and David Carr from Mississippi to Baton Rouge and booked them into the downtown jail. Thereafter, Keller and Yarborough first interviewed defendant at their detective office. Keller went over an advice of rights and consent to questioning form with defendant. Defendant signed the *597 form, and the interview that followed was tape-recorded. Later, shortly after midnight, Keller removed David Carr from his jail cell. In the presence of Keller and Sgt. Freddie Fletcher of the East Baton Rouge Parish Sheriff's Office, Carr executed an advice of rights and consent to questioning form. (State Exhibit 3) Carr then made a very detailed, tape-recorded confession to the instant offenses.
ASSIGNMENT OF ERROR NO. ONE:
By means of this assignment, defendant contends that the trial court erred by denying his motion to suppress Carr's tape-recorded confession. Defendant asserts that Carr initially invoked his Fifth Amendment right to counsel at the time of his arrest; that, thereafter, Carr was subjected to interrogation during the trip from Carr's apartment to the Gulfport Police Station, at which time Carr again invoked his right to counsel; and that Carr's eventual confession at the detective office in Baton Rouge occurred without counsel having been made available to him, in violation of the rule in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Additionally, defendant claims that, following Carr's invocation of the right to counsel, Carr neither initiated communications with the police nor waived his right to counsel in accordance with Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
Identical arguments were made on appeal by David L. Carr in his assignment of error number two. See State v. Carr, 530 So.2d 579 (La.App. 1st Cir.1988). Therein, we reviewed and found those arguments meritless. See State v. Carr, supra. Hence, for the reasons specified (in our treatment of assignment of error two) in State v. Carr, supra, defendant's assignment of error one is equally without merit.
ASSIGNMENTS OF ERROR TWO AND FOUR:
By means of these assignments, defendant contends that the trial court erred by denying his motion to suppress the physical evidence which was seized during the warrantless search of Carr's apartment. He argues that Carr's wife did not freely and voluntarily consent to the search of the Carrs' apartment because of police threats and duress and Ms. Carr's "extremely agitated mental condition." Defendant claims Ms. Carr was not informed she had the right to refuse to consent to the search. In addition, defendant argues that David Carr did not freely and voluntarily consent to the search and that David Carr's statements over the telephone to Detective Keller telling him where to find the currency were not freely and voluntarily made. Defendant asserts that Keller did not inform David Carr of his constitutional rights during the telephone call and that the statements disclosing the location of the currency were made in exchange for Keller's promise to get the money, leave the apartment and stop upsetting Carr's hysterical wife.
Identical arguments were made on appeal by David L. Carr in his assignment of error number one. See State v. Carr, supra. Therein, we reviewed and found those arguments meritless. Hence, for the reasons specified (in our treatment of assignment of error one) in State v. Carr, supra, defendant's assignments two and four are equally without merit.
ASSIGNMENT OF ERROR NO. THREE:
By means of this assignment, defendant contends (in his brief) that the trial court erred by failing to suppress his confession to Officers Keller, Yarborough and Pope during the interview conducted at the place of his employment. Defendant argues that he had been seized and arrested before he made that confession; and, because probable cause for his arrest was lacking, his arrest was illegal. He concludes that, as a consequence thereof, the confession should have been suppressed as having been tainted by the illegal arrest.
Defendant testified at the suppression hearing in regard to the circumstances of the interview at the restaurant which resulted in his confession to the instant offenses. He testified that Detectives Keller, Yarborough and Pope and two other officers spoke to him at the interview. He testified that he was "reasonably" sure there were five officers there. Defendant *598 stated that when the officers entered the restaurant he was "behind the cooking line." His manager asked him to come over and speak with the officers. He stated that, at that point, he had no objection to talking to the officers.
Defendant testified that four of the officers were in the closed off area of the dining room with him. A sliding door was used to close off the area, and the only exit was through that door. In describing the seating arrangement at the table used during the interview, defendant stated that he believed that Keller was seated on his left, Pope on his right and Yarborough in front of him. In regard to the other two officers, defendant testified that one was in the background seated at another table listening to the interview and the other was behind the sliding door which was used to close off the dining room.
Defendant testified that, when he seated himself at the table, Keller spoke to him first and said: "... You might as well talk. We know you did it. You and David did it. And he didn't evenhe didn't even say what. He justit was just, we know you did it." When asked if Keller told him he was a suspect, defendant replied as follows: "Yes, inin a general sense, but it wasit was more like he was more like he walked in and said, you know, we know you did it. So why don't you talk?"
Defendant stated that he felt that all he could do was sit there and try to answer the officers' questions, that he was not free to leave the officers and that he would have been physically restrained if he had tried to leave. He further stated that the presence of the officers and their seating arrangement also made him feel he could not leave.
However, on cross-examination, defendant contradicted his earlier testimony on direct examination by admitting that it was not the physical presence of other persons sitting next to him or that those persons were police officers that made him feel he could not leave. Instead he maintained that it was the "way" the officers were questioning and interrogating him that made him feel he could not leave. On further cross-examination, defendant testified that he was never told that he could not leave and that he never tried to leave. He never tried to leave because he was scared. Somewhat contradictorily, defendant stated that, "right before" he confessed, he told the officers he did not want to talk to them. Defendant explained that he confessed because it seemed like a "no win situation." Elaborating as to what he meant, defendant stated as follows: "Being questioned andI-I wouldn't say it was harassment, but it was verya lot of vocala lot of vocal questions and a lot of loud, loud talk." He felt the police would persist in their questioning until they got what they wanted.
Officers Keller, Yarborough, Pope and Gulfport Detective Tom Johnson testified for the state at the suppression hearing. Each gave testimony pertaining to the defendant's second interview at the restaurant.
Pope testified that he accompanied Keller and Yarborough to the restaurant as a common courtesy because those officers were outside their jurisdiction. Pope stated that Keller advised defendant of his Miranda rights, stated that they were investigating the robbery, that they felt very strongly that defendant and Carr had participated in the robbery, that they had a warrant for Carr's arrest and that it would be in defendant's best interest to tell the truth. According to Pope, after defendant initially "half-heartedly" denied his involvement, defendant confessed. Pope stated that defendant was very talkative, very relaxed and told them everything. Defendant volunteered the information. Pope testified that defendant was never touched, that no weapon was pulled or pointed at defendant and that no one threatened defendant. Pope further testified that, at the time of the interview, defendant was free to leave and that defendant would not and could not have been detained, (prior to his actual confession).
Yarborough and Keller testified that they first met defendant at the interview they had with him at the Shoney's Restaurant in Gulfport. Keller testified that Pope *599 introduced them to defendant. Keller described the seating arrangement used during the interview. He stated that he and Yarborough were seated at a rectangular dining table across from defendant, that he believed Pope was seated to his right, and that neither he nor Pope ever sat next to defendant. Yarborough's testimony in regard to the seating arrangement was consistent with Keller's description, although she stated that Pope was seated at the end of the table.
The testimony of Keller and Yarborough established that they went to see defendant at the restaurant because they wanted to question him and that there was no intent on their part to detain defendant. Although Keller and Yarborough's testimony revealed that the criminal investigation had begun to focus on defendant and that defendant's involvement was suspected, Yarborough testified that they did not have anything to "hold [defendant] on" before he confessed. Keller testified that defendant was free to leave the interview until he admitted he was Carr's co-perpetrator, at which point the officers had a sufficient basis to detain defendant.
Keller stated that the first thing he did at the interview was advise defendant of his Miranda rights. Keller stated that he explained why they were meeting with defendant and that defendant was informed that they had a warrant for Carr's arrest. According to Keller, defendant hesitated five to ten seconds; and then the first words defendant spoke were "something to the effect that I told David it would never work." Defendant then admitted his participation in the commission of the offenses. Keller testified that, after defendant confessed, he told defendant he would be detained. Keller stated that, prior to defendant's statements, he did nothing to lead defendant to believe that he was under arrest and that neither he nor anyone else told defendant he could not leave before defendant's statements admitting his participation in the crimes.
Keller testified that he did not badger defendant to make him talk during the interview. Keller emphatically denied that, during the interview, he ever accused defendant of having committed the crimes. Keller stated that he did not threaten defendant and that no one pointed a gun at defendant or threatened him with a weapon.
Keller testified that, initially, he, Yarborough and Pope were the only officers present at the interview with defendant. Keller stated that, later, Detective Johnson appeared and that he did not recall seeing any other officers at the restaurant.
Detective Johnson testified that Pope contacted him and requested that he come to the restaurant and transport defendant to the police station. Johnson stated that, when he arrived at the restaurant, defendant was in the dining room with Pope, Yarborough and Keller; and no other officers were present. Once there, Johnson walked into the dining room. Pope asked that Johnson transport defendant to the police station, and Johnson complied with that request. Johnson further testified that if any officer testified he was behind the restaurant's sliding door the officer would have erred.
The Fourth Amendment protects citizens against unreasonable searches and seizures, but not every encounter between a citizen and a policeman involves a "seizure." Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). Whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person. Id. at 16, 88 S.Ct. at 1877. As long as a reasonable person would feel free to disregard the encounter and walk away, there has been no `seizure.' State v. Ossey, 446 So.2d 280, 285 cert. denied, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (La.1984) (quoting Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)); State v. Oliver, 457 So.2d 1269 (La.App. 1st Cir.1984). Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in *600 evidence in a criminal prosecution his voluntary answers to such questions. Florida v. Royer, supra, 460 U.S. at 497, 103 S.Ct. at 1324. If there is no detention, i.e,no seizure within the meaning of the Fourth Amendmentthen no constitutional rights have been infringed. Id. at 498, 103 S.Ct. at 1324. In United States v. Mendenhall, 446 U.S. 544, at 554, 100 S.Ct. 1870, at 1877, 64 L.Ed.2d 497 (1980), Justice Stewart delivered the opinion of the court and stated (in a part of the opinion in which only Justice Rehnquist joined) as follows:
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
[Citations and footnote omitted]
Herein, we find that defendant's interview with Pope, Yarborough and Keller at his place of employment was consensual. Defendant did not object to talking to the officers when his manager asked him to do so. Although defendant gave conflicting testimony, he admitted at one point that the physical presence of the officers and the fact that they were law enforcement officers did not cause him to feel that he could not leave. Defendant further admitted that the officers never told him he could not leave; and defendant's suppression hearing testimony, asserting that the seating arrangement and the number of officers present made him feel he could not leave, was negated by the testimony of the officers. The officers' testimony revealed that only Pope, Keller and Yarborough were present during the interview and that neither the seating arrangement used during the interview nor the questioning procedure utilized was threatening. Although there was conflicting testimony as to whether or not defendant was informed that he was a suspect (before his initial inculpatory statement), Keller's testimony categorically denied that defendant was so informed. Viewing the totality of the circumstances presented herein, we conclude that a reasonable person would have believed he was free to leave. Accordingly, no seizure of defendant occurred until after defendant admitted his participation in the instant offenses. Hence, defendant's Fourth Amendment rights were not violated; and the trial court properly denied the motion to suppress.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. SEVEN:
By means of this assignment, defendant contends that the trial court erred by imposing excessive sentences and failing to comply with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1.
The record reveals that defendant's concurrent sentences of forty-five years at hard labor, without benefit of parole, probation or suspension of sentence for his guilty pleas to attempted aggravated kidnapping and armed robbery and thirty years at hard labor for his guilty plea to aggravated burglary were imposed pursuant to a plea bargain agreement between defendant and the state to which the trial court agreed.
We find that the trial judge erred in withdrawing the benefits of parole, probation or suspension of sentence from the defendant's attempted aggravated kidnapping conviction. The applicable sentencing statute for attempted aggravated kidnapping, La.R.S. 14:27(D)(1)[2], does not prohibit eligibility for parole, probation or suspension of sentence. See, State v. See, 467 So.2d 525 (La.1985). LSA-C.Cr.P. art. 882 provides that "An illegal sentence may be corrected ... by an appellate court on review." *601 Therefore, we amend the sentence imposed for the attempted aggravated kidnapping conviction to strike the portion of the sentence which withdraws these benefits.
As to the sentences imposed by the trial court for the armed robbery conviction and the aggravated burglary conviction, we find that defendant is precluded from challenging the excessiveness of these sentences because he entered into a plea bargain agreement which provided for specific sentences.
Where a specific sentence has been agreed to as a consequence of a plea bargain, that sentence cannot be appealed as excessive and there is no need for the trial judge to give reasons for the sentence as required by art. 894.1. State v. Carter, 460 So.2d 72 (La.App. 1st Cir.1984). Accordingly, we affirm the sentences imposed for the armed robbery and aggravated burglary convictions.
CONVICTIONS AFFIRMED, SENTENCES AFFIRMED IN PART AND AMENDED IN PART.
SAVOIE, J. agrees with the conviction but dissents from the sentencing, finding that the sentence imposed on this youthful first offender constitutes cruel and excessive punishment.
NOTES
[1] Following trial by jury, David L. Carr was convicted as charged in Counts I-VI; and he was subsequently sentenced. On appeal, we affirmed Carr's convictions and sentences. See State v. Carr, 530 So.2d 579 (La.App. 1st Cir. 1988).
[2] La.R.S. 14:27(D)(1) states: "If the offense so attempted is punishable by death or life imprisonment, he [one convicted of attempt] shall be imprisoned at hard labor for not more than fifty years."