HIGGINBOTHAM, J.
li/The defendant, Kelly L. Barnes, was charged by felony bill of information with possession of a firearm or carrying a concealed weapon by a convicted felon, a violation of La. R.S. 14:95.1. The defendant initially entered a plea of not guilty and filed a motion to suppress evidence. Subsequently, the trial court denied the defendant’s motion to suppress evidence. The defendant withdrew his original plea and pled guilty as charged, reserving the right to appeal the trial court’s ruling on the *1094 motion to suppress pursuant to State v. Crosby, 388 So.2d 584 (La.1976). The trial court sentenced the defendant to twenty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error to the trial court’s ruling on the motion to suppress.
STATEMENT OF FACTS
Because the defendant pled guilty to the instant offense, there was no trial to fully develop the facts. However, the background was adequately provided by the testimony presented at the motion to suppress hearing. On March 25, 2015, at approximately 10:00 p.m., Corporal James Pugh, a K-9 officer of the Franklinton Police Department (FPD), was on patrol when he observed two males walking together northbound on T.W, Barker Drive in Franklinton, a high-crime area. Corporal Pugh looked in his rear-view mirror as they passed his fully marked police unit, and observed them repeatedly looking back at his unit in what he described as a “nervous manner.” Corporal Pugh turned his unit around, exited the unit, and approached the two individuals.
Corporal Pugh recognized the white male, Jonathan Barber, who was well-known in the area for his involvement with narcotics, but did not recognize the black male, the defendant, who kept walking. After being alerted to approach the officer, the defendant walked back Toward Corporal Pugh and provided his name. Corporal Pugh questioned both individuals as to whether they were in possession of any 1 aweapons and Barber confirmed that he had a knife on him. The defendant claimed that he did not have any weapons on him. As Corporal Pugh removed Barber’s knife from his right pocket, the defendant- “repeatedly tried to walk away from the scene.” Corporal Pugh had to instruct the defendant to walk back towards him. After arriving on the scene within one or two minutes of the stop, Sergeant Brandon Manning (Corporal Pugh’s partner) also had to repeatedly instruct the defendant to walk back towards the police officers.'Sergeant Manning conducted a warrant check on the defendant and Barber and did not detect any outstanding warrants.
During the course of the stop, the defendant’s brother (identified as Kurstin) approached the scene. The police repeatedly instructed the defendant not to leave and observed him “quietly” whisper or “mouth” something to his brother. After again instructing the defendant to walk back towards him, Corporal Pugh asked him what was transpiring and again, if he had any weapons. Corporal Pugh further asked the defendant to place his hands on the unit, in an attempt to perform a pat-down frisk for weapons. At that point, the defendant walked to the front of Corporal Pugh’s unit and took flight. Corporal Pugh gave chase and during the short foot pursuit toward' a wooded area, observed the defendant discard an object. At that point, Corporal Pugh heard a heavy object crashing through limbs to the ground, and both he and the defendant lost their balance and fell to the ground. Corporal Pugh placed the defendant under arrest, walked back to the area where the object was discarded, and recovered a black 380 pistol. The area, including the ground, was still wet from dew and recent rain in the, area, but that the gun was dry and free of tarnish or rust. When they arrived at the police department, the defendant, after being advised of his rights, stated that the gun was not his property.
ASSIGNMENT OF ERROR
In the sole assignment of error, the defendant contends that the trial court erred in denying his motion to suppress *1095 the evidence. The defendant specifically argues |4that the police had no reason to suspect that he had committed, was committing, or was about to commit a crime. Comparing the facts of State v. Chopin, 372 So.2d 1222, 1224-1225 (La.1979), the defendant notes that in this case the police did not receive information connecting him to any criminal activity. The defendant also notes that he and Barber were walking in a well-lit area when Corporal Pugh observed him and that there were no outstanding warrants for the defendant or Barber. Citing State v. Truss, 317 So.2d 177, 178-179 (La.1975), the defendant contends that Corporal Pugh was not entitled to stop him simply because he looked back at the police cruiser after it passed him. Finally, the defendant contends that the trial court’s reliance on State v. Bessie, 2005-284 (La.App. 5th Cir. 11/29/05), 917 So.2d 615, 619-620, is misplaced, arguing that the case is distinguishable from the instant case because in Bessie the police had received a tip indicating specific instances of criminal activity in the area where the defendant therein was seen. Concluding that Corporal Pugh did not have the right to make an investigatory stop, the defendant contends that the evidence abandoned as a result thereof could not have been legally seized in this ease.
The Fourth Amendment to the United States Constitution and "Article I, § 5 of the Louisiana Constitution protect people against unreasonable searches and seizures. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. Code Crim. P. art. 703(A). Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the State to affirmatively show it was justified under one of the narrow exceptions to the rule requiring a search warrant. State v. Young, 2006-0234 (La.App. 1st Cir. 9/15/06), 943 So.2d 1118, 1122, writ denied, 2006-2488 (La. 5/4/07), 956 So.2d 606; see also La. Code Crim. P. art. 703(D).
While the Fourth Amendment protects citizens against unreasonable searches and seizures, not every encounter between a citizen and a policeman involves a “seizure.” Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). Accordingly, a threshold issue is to-determine whether the initial encounter between the police and the defendant constituted a seizure within the meaning of the Fourth Amendment. “[Wjhenever a police officer accosts an individual and restrains his freedom to walk away, he has ‘seized’ that person.” Terry v. Ohio, 392 U.S. at 16, 88 S.Ct. at 1877. As long as a reasonable person would feel free to disregard the encounter and walk away, there has been no seizure. Florida v. Royer, 460 U.S. 491, 497-498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); State v. Belton, 441 So.2d 1195, 1199 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984).
If a citizen, after being approached by law enforcement officers, consents to stop and answer questions, there is no Fourth Amendment violation. If there is no detention — no seizure within the meaning of the Fourth Amendment— then no constitutional rights have been infringed. Florida v. Royer, 460 U.S. at 497-498, 103 S.Ct. at 1324; State v. Oliver, 457 So.2d 1269, 1271 (La.App. 1st Cir. 1984). However, if there is a seizure such an investigatory stop must be based on reasonable suspicion that a person is com *1096 mitting, has committed, or is about to commit an offense. See La. Code'Crim. P. art. 215.1(A). While probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion, reasonable cause for an investigatory detention is something less than probable cause. Reasonable cause must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual’s right to be free from governmental | (¡interference. See State v. Warren, 2005-2248 (La. 2/22/07), 949 So.2d 1215, 1224; State v. Chopin, 372 So.2d at 1224.
In making a brief investigatory stop on less than probable cause to arrest, the police “must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.” State v. Kalie, 96-2650 (La. 9/19/97), 699 So.2d 879, 881 (per curiam) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The police must therefore articulate something more than an inchoate and unparticular-ized suspicion or hunch. See Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883. When a person is actually stopped without reasonable cause or when such stop is imminent, the right to “be left alone” is violated. Therefore, property abandoned or otherwise disposed of as a result of such a stop cannot be legally seized by the police. State v. Fleming, 457 So.2d 1232, 1234 (La.App. 1st Cir.), writ denied, 462 So.2d 191 (La.1984).
The mere presence of two men walking on a street at night in a high-crime area, with nothing more is, of itself, insufficient to justify an investigatory stop. See Fleming, 457 So.2d at 1234. See also State v. Temple, 2002-1895 (La. 9/9/03), 854 So.2d 856, 860-861, However, a location’s characteristics and an individual’s nervous, evasive behavior are articulable facts upon which a police officer may legitimately rely in determining whether the circumstances are sufficiently suspicious to warrant further investigation and are, therefore, relevant in the determination of reasonable suspicion. State v. Morgan, 2009-2352 (La. 3/15/11), 59 So.3d 403, 406. Moreover, drugs and guns and violence often go together, which might be a factor tending to support an officer’s claim of reasonableness. State v. Porche, 2006-0312 (La. 11/29/06), 943 So.2d 335, 340. Determining whether “reasonable, articu-lable suspicion” existed requires weighing all of the circumstances known to the police at the time the stop was made. Temple, 854 So.2d at 859. Police do not have to observe what they know to be criminal behavior |7before investigating. The requirement is that the officer have a reasonable suspicion of criminal activity. State v. Benjamin, 97-3065 (La. 12/1/98), 722 So.2d 988, 989.
In State v. Tucker, 626 So.2d 707, 712 (La.1993), the Louisiana Supreme Court, adopting the U.S. Supreme Court’s pronouncement in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), held that an individual has been “actually stopped,” i.e., seized, for purposes of La. Const, art. I, § 5, when he submits to a police show of authority or when he is physically contacted by police. The Tucker court recognized the necessity for determining what constitutes an “imminent actual stop” for those situations where the police attempt to seize an individual, but the individual neither submits to the police show of authority, nor is physically contacted by the police. Tucker, 626 So.2d at 712.
In determining whether an “actual stop” is “imminent,” the focus must be on the degree of certainty that the *1097 individual will be “actually stopped” as a result of the police encounter. This degree of certainty may be ascertained by examining the extent of police force employed in attempting the stop. An “actual stop” is imminent only when the police come upon an individual with such force that, regardless of the individual’s attempts to flee or elude the encounter, an actual stop of the individual is virtually certain. Id. Although non-exhaustive, Tucker instructs that.the following factors may be useful in assessing the extent of police force employed and determining whether that force was virtually certain to result in an “actual stop” of the individual: (1) the' proximity of the police in relation to the defendant at the outset of the encounter; (2) whether the individual has been surrounded by the police; (3) whether the police approached the individual with their weapons' drawn; (4) whether the police and/or the individual are on foot or in motorized vehicles during the encounter; (5) the location and characteristics of the area where the encounter takes place; and (6) the number óf police officers involved in the encounter. Tucker, 626 So.2d at 712-713.
Is At the hearing on the motion to suppress, Corporal Pugh testified that he became suspicious as the defendant and Barber repeatedly looked back at his unit in a “nervous manner” while walking at night in a high crime area. Corporal Pugh further specified that the area was known for the use and sale of elicit narcotics, and for the relationship between narcotics and weapons. Corporal Pugh further noted that he participated in the investigation of many burglaries and robberies in the area in the recent past. Corporal Pugh testified that as he exited his unit, his intention was to detain both individuals' to conduct an investigation. During cross-examination of Corporal Pugh by the defense attorney, the following colloquy took place:
Q. At the time you pulled up to [the defendant] and Mr. Barber, approximately how many feet away from the defendant was your vehicle?
A. Maybe ten to fifteen. ...
Q. Ten to fifteen. ... Okay. Did you, how did you get their attention that you were stopping to discuss the matter with them? Did you turn on your lights?
A. I pulled up right behind them with my head lights on them. I got out and I called [Jonathan Barber’s] name.
At the onset, Corporal Pugh called Barber by name, who was well known in the area ■ for his involvement with narcotics. While Barber stopped, the defendant continued to walk, but complied after Corporal Pugh hollered at him, telling him to come back. Barber instantly admitted that he had a knife on him. Corporal Pugh testified that while the defendant indicated that he did not have any weapons on him, he “repeatedly tried to walk away from the scene” and was communicating in a secretive manner with his brother, who approached briefly after the stop. As the defendant took flight (after he was told to put his hands on the unit for a pat-down frisk), Corporal Pugh was approximately five-feet away from the defendant when “his left arm come out in a manner like he is throwing something.” Just before hearing a thud, Corporal Pugh heard a heavy object crashing through limbs to the ground.
|3In denying the motion to suppress, the trial court provided written reasons for the ruling. After summarizing the applicable jurisprudence, the trial court considered the hearing testimony in concluding as follows, ■
In- the case before this Court, the defendant was walking at 10:00 o’clock at night in a high crime area and an area known for drug activity ... [Corporal] Pugh had knowledge of recent crim *1098 inal patterns and the areas frequent incidence of crimes ... [Corporal] Pugh found it ‘a little odd’ that the men would be walking in a high crime area at that time of night. After [Corporal] Pugh passed the men in his patrol vehicle, he observed them repeatedly looking over their shoulders nervously at him. ... Further,. [Corporal] Pugh recognized one of the two men, Jonathan Barber, to be a drug dealer.
The trial court concluded that based on the totality of the circumstances, Corporal Pugh had reasonable suspicion to justify the investigatory stop at the point that he exited his police unit, and that the weapon discarded by the. defendant was lawfully seized.
A trial court’s ruling on a motion to suppress the evidence is entitled to great weight, because the court had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Jones, 2001-0908 (La.App. 1 Cir. 11/8/02), 835 So.2d 703, 706, writ denied, 2002-2989 (La. 4/21/03), 841 So.2d 791. Correspondingly, when a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court’s discretion, i.e., unless such ruling is not supported by the evidence. See State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-281. However, a trial court’s legal findings are subject to a de novo standard of review. See State v. Hunt, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751.
As previously noted, the defendant argues that the trial court erred in relying on the Fifth Circuit Court of Appeal’s ruling in Bessie and argues that his case is more analogous to Chopin and Truss. In Bessie, the police officer stated that the subject’s nervousness and numerous glances drew his attention to the subject. The officer further explained that his suspicion was also aroused because he had received misinformation from several sources that day or the day before that individuals were traveling to the area within the vicinity of where the stop occurred to buy drugs, and then coming back into the city to sell them. The officer also explained that the area was “a high crime area” and “a high narcotics area.” Bessie, 917 So.2d at 618. The court found no error in the trial court’s denial of the defendant’s motion to suppress. Id., 917 So.2d at 620.
In Chopin, the Louisiana Supreme Court found that at the time the defendant discarded a brown paper bag containing marijuana, a detention was imminent. Specifically, the evidence was abandoned after the police “swung the patrol car around into his path, switched on the bright lights, and braked not more than three or four feet in front of him.” Chopin, 372 So.2d at 1224-1225. Further, the Court was convinced that the evidence therein was devoid of any basis upon which these officers could have lawfully detained the defendant at the time they observed him walking. The Court noted that the officers had no reason to have suspected that the accused had committed, was committing, or about to commit a crime. The Court noted that police officers are not entitled to stop at will any person in a well-lit, well-traveled area just because that person is walking along with a brown paper bag and becomes “kind of nervous” upon catching sight of >a patrol car. Since the officers did not have the right to make an investigatery stop, the evidence abandoned by the defendant as a result thereof could not have been legally seized by the officers. Id., 372 So.2d at 1225. Similarly, in Truss, the detention was held to be improper because the only articulable facts supporting it were that the defendant got a very startled look on his face, moved back a little, and continued on down the platform *1099 of the bus station, when he saw the police. Truss, 317 So.2d at 178.
In the instant case, Corporal Pugh did not come upon the individuals with force. Specifically (unlike the facts presented in Chopin), he did not, for example, swing the unit around into their path to effectuate an imminent stop. Instead, he I,initially stopped his unit ten to fifteen feet away from the defendant and Barber, before pulling up to them with his headlights illuminated. Corporal Pugh was the only officer at the scene at that point, thus the defendant and Barber were not surrounded. There was no indication that Corporal Pugh drew a weapon. Nor is this a case where law enforcement officers “sprang” from their patrol car and “overtook” an individual. Compare State v. Saia, 302 So.2d 869, 873 (La.1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975).
When Corporal Pugh exited his unit, the defendant did not stop, apparently feeling that he was not under detention and free to walk away. Corporal Pugh knew the defendant’s companion, Barber, and. was aware of Barber’s involvement with narcotics in that particular area. Corporal Pugh yelled at the defendant to come back, effectuating a stop. While Corporal Pugh conceded that he had no tip before the stop, the circumstances known to the officer at the time, including the high-crime characteristics of the area, the defendant and Barber’s nervous and furtive behavior, Barber’s narcotics history in the area, and the defendant’s evasiveness, were sufficient to create an articulable suspicion to stop and detain the defendant. Assuming, arguendo, that the stop was imminent when Corporal Pugh turned his unit around, before exiting his unit, Corporal Pugh had observed both the defendant and Barber repeatedly looking over their shoulders, making surreptitious glances. Corporal Pugh explained that the nervousness by both individuals, coupled with his specific knowledge of robberies, burglaries, drugs and weapon related offenses in the area, led him to turn his vehicle around to approach the individuals. After reviewing the record in this case, we find that Corporal Pugh had reasonable, articulable suspicion of criminal behavior by the defendant to conduct a lawful investigatory stop.
After a lawful investigatory stop, a police officer may frisk the suspect only where a reasonably prudent person would be warranted in the belief that his safety |12or that of others is in danger. Therefore, the reasonableness of a frisk is governed by an objective standard. State v. Sims, 2002-2208 (La. 6/27/03), 851 So.2d 1039, 1043-1044. In this ease, Officer Pugh attempted to frisk the defendant only after Barber admitted that he had a knife on'his person. While the defendant twice dénied having a weapon, considering the defendant and companion Barber’s initial nervous behavior, the fact that Barber was known for narcotics activity and was armed with a weapon, and the fact that the defendant repeatedly walked away from the police, Corporal Pugh was reasonable in concluding that his safety was at issue. The defendant, fled and abandoned the gun after a lawful investigatory stop, and therefore, the weapon was subject to seizure. Considering the foregoing, we find no abuse of discretion or error in the trial court’s denial of the motion to suppress. The sole assignment of error-is without merit.
PATENT ERROR REVIEW
This Court routinely reviews the record for patent errors pursuant to La. Code Crim. P. art. 920, which provides that the only matters to be considered on appeal are errors designated in the assign *1100 ments of error and “error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.” La. Code Crim. P. art. 920(2). After a careful review of the record in these proceedings, we have found no reversible errors. However, we note that in sentencing the defendant on the conviction of possession of a firearm or carrying a concealed weapon by a convicted felon, the trial judge did not impose the mandatory fine of not less than one thousand dollars nor more than five thousand dollars. See La. R.S. 14:95.1(B). The trial court’s failure to impose the fine certainly is not inherently prejudicial to the defendant. As such, we decline to correct the illegally lenient sentence. See State v. Price, 2005-2514 (La.App. 1st Cir. 12/28/06), 952 So.2d 112, 123-125 (en banc), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277.[1]
CONVICTION AND SENTENCE AFFIRMED.

. We note that in this case there is no indication in the record that the parties agreed to depart from the mandatory sentencing terms pursuant to La. Code Crim. P. art. 890.1.